# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

CHRISTINE MATLOCK,

        Plaintiff,

     vs.                                       **Civ. No. 16-1215 KK**

NANCY A. BERRYHILL,[1]
Acting Commissioner of Social Security,

        Defendant.

## MEMORANDUM OPINION AND ORDER[2]

**THIS MATTER** is before the Court on the Social Security Administrative Record (Doc. 15) filed April 26, 2017, in support of Plaintiff Christine Matlock's ("Plaintiff") Complaint (Doc. 1) seeking review of the decision of Defendant Nancy A. Berryhill, Acting Commissioner of the Social Security Administration, ("Defendant" or "Commissioner") denying Plaintiff's claim for Title II disability insurance benefits and Title XVI supplemental security income benefits. On July 28, 2017, Plaintiff filed her Motion to Remand or Reverse ("Motion"). (Doc. 22.) The Commissioner filed a Response in opposition on September 22, 2017 (Doc. 24), and Plaintiff filed a Reply on October 11, 2017. (Doc. 25.) The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c). Having meticulously reviewed the entire record and the applicable law and being fully advised in the premises, the Court finds the Motion is well taken and is **GRANTED.**

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Nancy A. Berryhill is substituted for Carolyn Colvin as the Acting Commissioner of the Social Security Administration. Fed. R. Civ. P. 25(d).

[2] Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings, and to enter an order of judgment, in this case. (Docs. 6, 9, 10.)

# I. <u>Background and Procedural Record</u>

Claimant Christine Matlock ("Ms. Matlock") alleges that she became disabled on July 15, 2009, at the age of forty because of fibromyalgia, back pain, foot pain, neck pain, chronic sleeping disorder, depression, mood disorder, blurred vision, breathing problems, and thyroid problems. (Tr. 252, 271.[3]) Ms. Matlock completed high school in 1986, and completed lab assistant, surgical technician, and certified nurse assistant courses in 2004, 2005 and 2006, respectively. (Tr. 272.) Ms. Matlock worked as a caregiver, clerk/cashier, lab assistant, surgical technician, office clerk, and waitress/cook. (Tr. 257.) Ms. Matlock stopped working on July 15, 2009, because of her medical conditions. (Tr. 271.)

On November 26, 2012, Ms. Matlock protectively filed an application for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. § 401 et seq. (Tr. 219-222, 253.) Ms. Matlock concurrently filed an application for Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381 et seq. (Tr. 223-28.) Ms. Matlock's applications were initially denied on February 22, 2013. (Tr. 69-82, 83-96, 97, 98, 131-35.) They were denied again at reconsideration on August 9, 2013. (Tr. 99-113, 114-28, 129, 130, 138-41.) On October 1, 2013, Ms. Matlock requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 142-43.) ALJ Myriam C. Fernandez Rice conducted a hearing on May 14, 2015. (Tr. 33-67.) Ms. Matlock appeared in person at the hearing with attorney representative Michael Armstrong. (*Id*.) The ALJ took testimony from Ms. Matlock (Tr. 39-59, 60-63), and an impartial vocational expert ("VE"), Judith Beard. (Tr. 59-61, 63-66.) On June 22, 2015, the ALJ issued an unfavorable decision. (Tr. 14-27.)

---

[3] Citations to "Tr." are to the Transcript of the Administrative Record (Doc. 15) that was lodged with the Court on April 26, 2017.

On September 3, 2016, the Appeals Council issued its decision denying Ms. Matlock's request for review and upholding the ALJ's final decision. (Tr. 1-4.) On November 4, 2016, Ms. Matlock timely filed a Complaint seeking judicial review of the Commissioner's final decision. (Doc. 1.)

## II. Applicable Law

### A. Disability Determination Process

An individual is considered disabled for purposes of Social Security disability insurance benefits if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Commissioner has adopted the familiar five-step sequential analysis to determine whether a person satisfies the statutory criteria as follows:

(1) At step one, the ALJ must determine whether the claimant is engaged in "substantial gainful activity."[4] If the claimant is engaged in substantial gainful activity, she is not disabled regardless of her medical condition.

(2) At step two, the ALJ must determine the severity of the claimed physical or mental impairment(s). If the claimant does not have an impairment(s) or combination of impairments that is severe and meets the duration requirement, she is not disabled.

(3) At step three, the ALJ must determine whether a claimant's impairment(s) meets or equals in severity one of the listings described in Appendix 1 of the regulations and meets the duration requirement. If so, a claimant is presumed disabled.

(4) If, however, the claimant's impairments do not meet or equal in severity one of the listing described in Appendix 1 of the regulations, the ALJ must determine at step four whether the claimant can perform her "past relevant work." Answering this question involves three phases. *Winfrey v. Chater*,

---

[4] Substantial work activity is work activity that involves doing significant physical or mental activities. 20 C.F.R. §§ 404.1572(a), 416.972(a). Work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before. *Id.* Gainful work activity is work activity that you do for pay or profit. 20 C.F.R. §§ 404.1572(b), 416.972(b).

92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ considers all of the relevant medical and other evidence and determines what is "the most [claimant] can still do despite [her physical and mental] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). This is called the claimant's residual functional capacity ("RFC"). *Id.* §§ 404.1545(a)(3), 416.945(a)(3). Second, the ALJ determines the physical and mental demands of claimant's past work. Third, the ALJ determines whether, given claimant's RFC, the claimant is capable of meeting those demands. A claimant who is capable of returning to past relevant work is not disabled.

(5)     If the claimant does not have the RFC to perform her past relevant work, the Commissioner, at step five, must show that the claimant is able to perform other work in the national economy, considering the claimant's RFC, age, education, and work experience. If the Commissioner is unable to make that showing, the claimant is deemed disabled. If, however, the Commissioner is able to make the required showing, the claimant is deemed not disabled.

*See* 20 C.F.R. § 404.1520(a)(4); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005). The claimant has the initial burden of establishing a disability in the first four steps of this analysis. *Bowen v. Yuckert*, 482 U.S. 137, 146, n.5, 107 S.Ct. 2287, 2294, n. 5, 96 L.Ed.2d 119 (1987). The burden shifts to the Commissioner at step five to show that the claimant is capable of performing work in the national economy. *Id.* A finding that the claimant is disabled or not disabled at any point in the five-step review is conclusive and terminates the analysis. *Casias v. Sec'y of Health & Human Serv.*, 933 F.2d 799, 801 (10th Cir. 1991).

**B.     <u>Standard of Review</u>**

This Court must affirm the Commissioner's denial of social security benefits unless (1) the decision is not supported by "substantial evidence" or (2) the ALJ did not apply the proper legal standards in reaching the decision. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004); *Casias,* 933 F.2d at 800-01. In making these determinations, the Court "neither reweigh[s] the

evidence nor substitute[s] [its] judgment for that of the agency.'" *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008). A decision is based on substantial evidence where it is supported by "relevant evidence . . . a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118. A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley,* 373 F.3d at 1118, or "constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992). The agency decision must "provide this court with a sufficient basis to determine that appropriate legal principles have been followed." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005). Therefore, although an ALJ is not required to discuss every piece of evidence, "the record must demonstrate that the ALJ considered all of the evidence," and "the [ALJ's] reasons for finding a claimant not disabled" must be "articulated with sufficient particularity." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996).

### III. <u>Analysis</u>

The ALJ made her decision that Ms. Matlock was not disabled at step four of the sequential evaluation. She found that Ms. Matlock had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(a) and 416.967(a).

> Specifically, the claimant is able to lift up to 20 pounds on an occasional basis; lift or carry up to 10 pounds frequently; stand or walk for approximately six hours per eight-hour workday; and sit for approximately six hours per eight-hour workday, with normal breaks. From a mental standpoint, the claimant is able to understand, remember, and carry out detailed, but not complex instructions; make decisions; attend and concentrate for extended periods of time; accept instructions; and respond appropriately to changes in routine work settings. She should have only occasional in person interaction with the public and co-workers, but no limitations with telephone interactions.

(Tr. 22.)  Based on the RFC and the testimony of the VE, the ALJ concluded that Ms. Matlock was capable of performing her past relevant work as a medical coder and that she was not disabled.  (Tr. 27.)

Ms. Matlock argues in support of her Motion that (1) the ALJ's decision does not include a necessary function-by-function assessment of Ms. Matlock's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis; and (2) the ALJ failed to properly evaluate the medical opinions of State agency examining psychological consultant Louis Wynne, Ph.D., State agency nonexamining psychological consultant Carol Mohney, Ph.D., and Treating Psychologist Bradley Samuel, Ph.D.  (Doc. 22 at 8-16.)  The Court finds grounds for remand as discussed below.

A. **Mental Impairment Medical Opinion Evidence**

1. **State Agency Examining Psychological Consultant Louis Wynne, Ph.D.**

On February 3, 2012, Ms. Matlock presented to State agency examining psychological consultant Louis Wynne, Ph.D., for a disability determination examination.[5]  (Tr. 378-81.) Ms. Matlock reported a medical history of fibromyalgia, possible heart murmur, periodic breathing difficulties, a microplasm, Chlamydia-pneumonia, hypothyroidism, an auto-immune condition related to her eyes, spine issues, and possible degenerative disc disease.  (Tr. 380.) She also described falling off a swing as a child and hitting her head; falling off a horse as a child and hitting her head on a rock; and hitting her head against bunk beds more than once as a child – all without medical attention.  (Tr. 379.)  Ms. Matlock reported a mental health history of

---

[5] On October 20, 2010, Dr. Wynne performed a disability determination examination related to an earlier claim for disability.  (Tr. 534-36.)  Dr. Wynne's Axis I diagnoses were major depression, mood disorder/depression, r/o cognitive disorder, r/o borderline intellectual functioning.  (Tr. 536-37.)  Dr. Wynne's assessed then that Ms. Matlock "could read and understand basic written instructions but her concentration and ability to persist at simple work tasks are at least mildly impaired.  She could interact with the general public and her coworkers but she might have difficulty interacting with her supervisors.  She also might have difficulty adapting to changes in the workplace.  She could recognize obvious hazards but she could not manage her own benefit payments."  (Tr. 536.)

depression in her mid-20s due to an abusive relationship. (Tr. 380.) Dr. Wynne noted that (1) Ms. Matlock maintained good eye contact, related easily, and was cooperative; (2) her affect was flat, but she was alert and knew the purpose of the examination; (3) she spoke clearly, and loudness, emphasis, tonality, and amount of speech were all within normal limits; (4) she denied any alterations in consciousness and her sensorium seemed clear with no indication of any drugs or psychotic process; and (5) she was not a good historian. (Tr. 378.) On mental status exam, Ms. Matlock was (1) able to copy a pair of intersecting pentagons; (2) remember and carry out a written three-part set of directions; (3) count backwards from 100 both by threes and by sevens; (4) remember a set of four digits forwards and backwards; (5) spell a common five-letter word backwards; (6) remember two of three words at an interval of three minutes with two intervening tasks; and (7) unevenly perform operations of simple arithmetic. (Tr. 379.) Dr. Wynne observed that Ms. Matlock's judgment, based on her answers to Wechsler Adult Intelligence Scale-type comprehension questions, was unimpaired. (*Id.*) Dr. Wynne estimated Ms. Matlock was probably of average intelligence before puberty, but that her current intelligence was probably lower. (*Id.*)

Dr. Wynne summarized that

[Ms. Matlock] is a 43-year-old woman who looked her age. She cooperated fully with this examination and there is no reason to suspect malingering or dissimulation.

She can read and understand basic written instructions and her concentration and ability to persist at simple work tasks are no more than mildly impaired. She could not interact well with the general public, her coworkers, or her supervisors, and she also might have difficulty adapting to changes in the workplace. She could recognize obvious hazards and manage her own benefit payments.

(Tr. 380.) Dr. Wynne's Axis I diagnoses included major depression, recurrent, severe, without psychotic features, and mood disorder/depression due to severe chronic illness. (Tr. 381.)

Dr. Wynne noted an Axis III diagnosis of history of head injury "[p]er claimant allegations." (*Id.*)  Dr. Wynne assessed a GAF score of 48.[6]  (*Id.*)

The ALJ accorded only partial weight to Dr. Wynne's opinion explaining that (1) a good portion of his opinion was based on Ms. Matlock's self reports of a history of head injuries; (2) Dr. Wynne indicated that Ms. Matlock was a poor historian and her claims should be verified before any reliance was placed on them; (3) Ms. Matlock performed well on the mental exam testing; (4) Ms. Matlock was currently attending a certificate course for medical billing/coding, which involves more than basic simple instructions and tasks; and (5) Dr. Wynne does not have a treating relationship with the claimant and his evaluation was only a snapshot of the claimant's overall functional limitations.  (Tr. 24-25.)

###    2.    State Agency Nonexamining Psychological Consultant Carol Mohney, Ph.D.

On February 21, 2013, State agency nonexamining psychological consultant Carol Mohney, Ph.D., reviewed Ms. Matlock's records at the initial level of evaluating Ms. Matlock's disability claim.[7]  (Tr. 75-76, 79-80.)  Dr. Mohney prepared a Psychiatric Review Technique Form ("PRTF")[8] and a Mental Residual Functional Capacity Assessment ("MRFCA").  (*Id.*)  In

---

[6] The GAF is a subjective determination based on a scale of 100 to 1 of "clinician's judgment of the individual's overall level of functioning."  *Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* (4th ed. 2000) at 32.  GAF score of 41-50 indicates serious symptoms (*e.g.,* suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  *Id.* at 34.

[7] Dr. Mohney reviewed Dr. Louis Wynne's consultative exam findings and Ms. Matlock's reported activities of daily living.  (Tr. 75.)

[8] "The psychiatric review technique described in 20 CFR 404.1520a and 416.920a and summarized on the Psychiatric Review Technique Form (PRTF) requires adjudicators to assess an individual's limitations and restrictions from a mental impairment(s) in categories identified in the "paragraph B" and "paragraph C" criteria of the adult mental disorders listings.  The adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process."  SSR 96-8p, 1996 WL 374184, at *4.  Dr. Mohney assessed that Ms. Matlock had mild restrictions in activities of daily living; moderate difficulties in maintaining social

8

Section I of the MRFCA, Dr. Mohney assessed that Ms. Matlock had no limitations in her ability to (1) to respond appropriately to changes in the work setting; (2) to be aware of normal hazards and take appropriate precautions; (3) to travel in unfamiliar places or use public transportation; and (4) to set realistic goals or make plans independently of others. (Tr. 80.) Dr. Mohney assessed that she was *not significantly limited* in her ability (1) to remember locations and work-like procedures; (2) to understand and remember very short and simple instructions; (3) to carry out very short and simple instructions; (4) to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (5) to make simple work-related decisions; (6) to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (7) to ask simple questions or request assistance; and (8) to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (Tr. 79-80.) Dr. Mohney assessed that Ms. Matlock was *moderately limited* in her ability to (1) understand and remember detailed instructions; (2) to carry out detailed instructions; (3) to maintain attention and concentration for extended periods; (4) to sustain an ordinary routine without special supervision; (5) to work in coordination with or in proximity to others without being distracted by them; (6) to interact appropriately with the general public; (7) to accept instructions and respond appropriately to criticism from supervisors; and (8) to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (*Id.*) In Section III of the MRFCA, Dr. Mohney explained that "[b]ased on the MER and ADLs, the claimant is capable of performing simple, unskilled work involving limited interactions with others." (Tr. 80.)

---

functioning; moderate difficulties in maintaining concentration, persistence and pace; and no repeated episodes of decompensation. (Tr. 75.)

The ALJ noted in her determination, without more, that "[t]he State agency determined that the claimant could perform simple unskilled work with limited interactions with others[.]" (Tr. 26.)

### 3. State Agency Nonexamining Psychological Consultant Paul Cherry, Ph.D.

On August 1, 2013, State agency nonexamining psychological consultant Paul Cherry, Ph.D., reviewed Ms. Matlock's records at the reconsideration level of evaluating Ms. Matlock's disability claim.[9] (Tr. 105-06, 109-111.) Dr. Cherry's MRFCA findings and assessment were identical to Dr. Mohney's, (Tr. 79-80, 109-111), and Dr. Cherry concluded that based on the medical evidence record and Ms. Matlock's activities of daily living that Ms. Matlock was capable of performing simple, unskilled work involving limited interactions with others. (Tr. 111.)

The ALJ noted in her determination, without more, that "[t]he State agency determined that the claimant could perform simple unskilled work with limited interactions with others[.]" (Tr. 26.)

### 4. Treating Psychologist Bradley Samuel, Ph.D.

On September 23, 2014, Ms. Matlock presented to Bradley Samuel, Ph.D., at the University of New Mexico's Department of Family and Community Medicine. (Tr. 471-72.) Ms. Matlock was referred by her primary care physician Valerie Carrejo, M.D., who stated "[t]his patient has a history of depression, anxiety and is requesting counseling." (Tr. 471.) Ms. Matlock reported a history of chronic pain in the form of fibromyalgia, sleeplessness,

---

[9] Dr. Cherry reviewed Dr. Louis Wynne's consultative exam findings and Ms. Matlock's reported activities of daily living. (Tr. 106.) Dr. Cherry also added a "Recon Discussion," that noted his review of records from a February 7, 2013, "well woman" exam, and July 2, 2013, family practice visit with subjective complaints of fatigue and depression. (*Id.*) Dr. Cherry concluded that "[p]rior unskilled still appears reasonable." (*Id.*)

problems with blurry vision, depression, anxiety, and reports that all were chronic conditions. (*Id.*) She reported depression on and off since childhood. (*Id.*) She stated that her medical conditions began 20 years ago related to multiple causes, but in particular that she "swallowed a filling at a dentist's office" resulting in high mercury in her blood. (Tr. 470-71.) Ms. Matlock described her symptoms of depression and fibromyalgia as "foggy brain, chronic pain, as noted sleeping, hypersensitive to food, meds, thirst." (Tr. 471.) She also described depression as sadness, "at which point she became tearful." (*Id.*) Ms. Matlock endorsed passive suicidal ideation. (*Id.*)

On mental status exam, Dr. Samuel noted that Ms. Matlock was (1) very laid back, calm demeanor; (2) described herself as a "pushover"; (3) oriented in all spheres; (4) very talkative and anxious; (5) suicidal ideation noted – risk deemed low to moderate – will monitor; (6) attention, memory and concentration intact; and (7) tearful when asked to check in with herself and breath. (*Id.*)

Dr. Samuel admitted Ms. Matlock to the Behavioral Health Clinic and anticipated 6-12 sessions to address her depression, anxiety, and chronic pain. (Tr. 472.) Dr. Samuel's discharge diagnoses were (1) major depressive disorder, recurrent, moderate, and will assess for posttraumatic stress disorder. (*Id.*)

Ms. Matlock saw Dr. Samuel again on October 13, 2014. (Tr. 470.) Dr. Samuel noted that "[s]omatic concerns/sleep problems remain salient focus of treatment." (*Id.*) He noted that Ms. Matlock listed all of her ideas about her various medical problems, including "high mercury in [her] blood," and worried when the medical community didn't take her seriously. (*Id.*) Dr. Samuel noted that Ms. Matlock (1) reported emotional pain; (2) was quite tearful and sad; (3) was angry because of not feeling safe in the interpersonal sphere. (*Id.*) Dr. Samuel explained

that Ms. Matlock conveyed she was not safe or comfortable in her own body, and that it was hard for her to trust doctors because they don't believe her. (*Id.*) Dr. Samuel indicated he was left wondering about the role anxiety and social anxiety played in Ms. Matlock's decision making. (*Id.*)

Dr. Samuel's discharge diagnosis on this date was major depressive disorder, recurrent, moderate. (Tr. 470.) Dr. Samuel indicated that Ms. Matlock was "unable to work due to multiple somatic medical conditions." (*Id.*) He planned to rule out conversion disorder and somatic disorder. (*Id.*)

On May 28, 2015, Dr. Samuel completed a Medical Assessment of Ability To Do Work-Related Activities (Mental). (Tr. 530-31.) In the category of "Understanding and Memory Limitations," Dr. Samuel assessed that Ms. Matlock had *moderate limitations* in her ability to understand and remember detailed instructions. (Tr. 530.) He made no assessment regarding Ms. Matlock's ability (1) to remember locations and work-like procedures and (2) to understand and remember very short and simple instructions. (*Id.*) Dr. Samuel explained that he was unable to comment because he had only seen Ms. Matlock twice, but that she reported memory and concentration difficulties and he noted at intake that she reported "foggy brain." (*Id.*) In the category of "Sustained Concentration and Persistence Limitations," Dr. Samuel assessed that Ms. Matlock had *slight limitations* in her ability to make simple work-related decisions; *moderate limitations* in her ability (1) to maintain attention and concentration for extended periods of time (*i.e.,* 2-hour segments); and (2) to sustain an ordinary routine without special supervision. (*Id.*) He assessed she had *marked limitations* in her ability (1) to carry out detailed instructions; and (2) to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerance. (*Id.*) Dr. Samuel made no assessment regarding

Ms. Matlock's ability (1) to carry out very short and simple instructions; (2) to work in coordination with/or proximity to others without being distracted by them; and (3) to complete a normal workday and workweek without interruptions from psychological based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (*Id.*) Dr. Samuel explained that he was unable to evaluate "most of the above" because Ms. Matlock was seen for two one hour appointments and the focus was on treatment for depression and less on assessment for work. (*Id.*) In the category of "Social Interaction Limitations," Dr. Samuel assessed that Ms. Matlock had *moderate limitations* in her ability (1) to interact appropriately with the general public; and (2) to accept instructions and respond appropriately to criticism from supervisors. (Tr. 531.) He assessed *marked limitations* in her ability to ask simple questions or request assistance. (*Id.*) Dr. Samuel made no assessment regarding Ms. Matlock's ability (1) to get along with coworkers or peers without distracting them or exhibiting behavioral extremities; or (2) to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (*Id.*) Dr. Samuel referred to Ms. Matlock's medical records and explained that he was unable to comment or assess this category in full. (*Id.*) Finally, the category of "Adaptation Limitations," Dr. Samuel made no assessments, and explained that he was unable to evaluate based on only two medical notes. (*Id.*)

Dr. Samuel described Ms. Matlock's mental limitations as "emotionally compromised / somatic complaints / "foggy brain" / sadness – chronic pain / difficulty tracking conversation." (Tr. 531.)

Dr. Samuel also completed a 12.04 *Affective Disorders* form and indicated that Ms. Matlock had depressive syndrome characterized by sleep disturbance, decreased energy, difficulty concentrating or thinking, and thoughts of suicide, that resulted in marked restrictions

of activities of daily living, marked difficulties in maintaining social functioning, and marked difficulties in maintaining concentration, persistence, or pace. (Tr. 532.) Dr. Samuel also checked that Ms. Matlock had a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support. (*Id.*)

The ALJ accorded Dr. Samuel's opinion little weight because he indicated he was unable to assess Ms. Matlock's limitations in several functional areas, because he had a limited treatment history with her, and because he indicated that he relied on her self-reports of symptoms to reach his conclusions. (Tr. 25.)

### B.       The ALJ Failed To Properly Evaluate the Medical Opinion Evidence Related to Ms. Matlock's Mental Impairments

Ms. Matlock argues that the ALJ failed to properly evaluate the medical opinion evidence related to her mental impairments. Specifically, she argues that (1) the ALJ's reasons for rejecting Dr. Wynne's opinion are not legitimate and were based, in part, on speculation (2) the ALJ failed to evaluate Dr. Mohney's opinion at all, and to the extent the ALJ inadvertently adopted certain of Dr. Mohney's limitations, she rejected others without explanation; and (3) the ALJ applied the wrong legal standard in evaluating Dr. Samuel's opinion and failed to provide legitimate reasons for rejecting his opinion. (Doc. 22 at 11-16.) The Commissioner contends that the ALJ's RFC adequately accounted for Ms. Matlock's mental limitations. (Doc. 24 at 6-9.) The Commissioner specifically asserts that (1) the ALJ reasonably relied on Ms. Matlock's testimony regarding her online participation in a medical billing/coding class to determine that Ms. Matlock was capable of more than unskilled work; (2) the ALJ adequately captured the social limitations assessed by the various medical opinions, and (3) the ALJ reasonably called

into question Dr. Samuel's status as a treating physician and properly relied on the constraints Dr. Samuel himself placed on his opinion. (*Id.*) The Commissioner concludes that although the ALJ's decision may be technically imperfect, the ALJ's reasoning is discernable and remand is not warranted. (*Id.*)

"An ALJ must evaluate every medical opinion in the record, although the weight given each opinion will vary according to the relationship between the disability claimant and the medical professional." *Hamlin*, 365 F.3d at 1215. Specifically, when assessing a claimant's RFC, an ALJ must explain what weight is assigned to each opinion and why. SSR 96-5p, 1996 WL 374183 at *5.[10] "An ALJ must also consider a series of specific factors in determining what weight to give any medical opinion." *Hamlin*, 365 F.3d at 1215 (citing *Goatcher v. United States Dep't of Health & Human Servs.*, 52 F.3d 288, 290 (10th Cir. 1995)).[11] An ALJ need not articulate every factor; however, the ALJ's decision must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007). In deciding how much weight to give a treating source opinion, an ALJ must first determine whether the opinion qualifies for controlling weight. *Langley*, 373 F.3d at 1119 (citing *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003)). Even if a treating physician's opinion is not entitled to controlling weight, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the [regulatory] factors." *Id.*

---

[10] The Social Security Administration rescinded SSR 96-5p effective March 27, 2017, only to the extent it is inconsistent with or duplicative of final rules promulgated related to Medical Source Opinions on Issues Reserved to the Commissioner found in 20 C.F.R. §§ 416.920b and 416.927 and applicable to claims filed on or after March 27, 2017. 82 Fed. Reg. 5844, 5845, 5867, 5869.

[11] These factors include the examining relationship, treatment relationship, length and frequency of examinations, the degree to which the opinion is supported by relevant evidence, the opinion's consistency with the record as a whole, and whether the opinion is that of a specialist. *See* 20 C.F.R. § 416.927(c)(2)-(6) (evaluating opinion evidence for claims filed before March 27, 2017).

Generally the opinion of a treating physician is given more weight than that of an examining consultant, and the opinion of a non-examining consultant is given the least weight of all. *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004). Ultimately, ALJs are required to weigh medical source opinions and to provide "appropriate *explanations* for accepting or rejecting such opinions." SSR 96-5p, 1996 WL 374183 at *5 (emphasis added); *see Keyes-Zachary v Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012) (citing 20 C.F.R. § 416.927(e)(2)(ii))).

### 1. The ALJ's Reasons for According Partial Weight to Dr. Wynne's Opinion Are Not Supported by Substantial Evidence

#### a. The ALJ's First Explanation

In discounting Dr. Wynne's opinion, the ALJ first explained that "a good portion of [Dr. Wynne's] opinion was based on Ms. Matlock's self reports of a history of head injuries." (Tr. 24.) The Court's review of Dr. Wynne's report does not support this explanation. In his report, Dr. Wynne documented Ms. Matlock's *childhood* medical history, in which she reported hitting her head on different occasions. (Tr. 379.) Dr. Wynne then noted an Axis III (general medical conditions)[12] diagnosis that "[p]er claimant allegations, history of head injury." (Tr. 381.) Dr. Wynne also noted Axis I (clinical disorder) diagnoses of major depression and mood disorder.[13] (Tr. 381.) In summarizing his conclusions and impressions, Dr. Wynne explained that his "impressions [were] based on [his] estimation of the claimant's psychological condition and *not* on any medical limitations that might be present." (Tr. 380.) (Emphasis added.) There is no indication explicitly or implicitly in Dr. Wynne's report to suggest that a "good portion" of his functional assessment was based on Ms. Matlock's history of head injuries. At best, the

---

[12] General medical conditions can be regarded as being directly related to mental disorders, being important to the overall diagnostic picture, or not having a sufficient relationship. http://www.psyweb.com/DSM_IV/jsp/Axis_III.jsp.

[13] Axis I is the top-level of the DSM multiaxial system of diagnosis. It represents acute symptoms that need treatment. http://www.psyweb.com/DSM_IV/jsp/Axis_I.jsp.

ALJ's first explanation amounts to mere speculation, which is not allowed, and is not supported by substantial evidence. *See generally Langley*, 373 F.3d at 1121 (an ALJ may not make speculative inferences from medical reports).

### b.     The ALJ's Second Explanation

The ALJ next explained that Dr. Wynne indicated that Ms. Matlock was a poor historian and that *her claims* should be verified before any reliance was placed on them. (Tr. 24.) However, the ALJ mischaracterized Dr. Wynne's statement. Dr. Wynne made no reference to discounting Ms. Matlock's "claims" based on being a poor historian. Instead, Dr. Wynne stated that the *details in the following account* of her various histories (childhood, education, family, employment and medical) should be verified before any reliance is placed on them because she was not a good historian. (Tr. 379.) Importantly, Dr. Wynne stated elsewhere in his opinion that Ms. Matlock cooperated fully with the examination and there was no reason to suspect malingering or dissimulation. (Tr. 380.) The ALJ's second explanation mischaracterizes Dr. Wynne's statement and is not supported by substantial evidence.

### c.     The ALJ's Third Explanation

The ALJ next explained that she discounted Dr. Wynne's opinion because Ms. Matlock performed well on the mental status exam. However, Dr. Wynne was well aware of Ms. Matlock's performance on the mental status exam and nonetheless diagnosed her with major depression and mood disorder and assessed her with certain functional limitations. "[A] psychological opinion may rest either on observed signs and symptoms or on psychological tests," and Dr. Wynne's observations about Ms. Matlock's limitations constituted "specific medical findings." *Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004). Therefore, the ALJ's third explanation, without more, amounts to substituting her lay opinion for that of

Dr. Wynne's, which is not allowed.  *See generally Langley*, 373 F.3d at 1121 (an ALJ may not reject a medical opinion due to her own lay opinion).

### d.    The ALJ's Fourth Explanation

The ALJ's fourth explanation, that Ms. Matlock was "currently attending a certificate course for medical billing/coding, which involves more than basic simple instructions and tasks," is not supported by substantial evidence.  (Tr. 24.)  At the Administrative Hearing, Ms. Matlock testified that she was enrolled in an at-home study course for medical billing and coding.  (Tr. 39.)  She further testified that she previously worked as an "on-the-job training" medical coder in 2003.  (*Id.*)  The ALJ asked Ms. Matlock

Q.    And how long have you been trying to, this most recent attempt?  When did that start?

A.    About a year and four months ago, I started it.

Q.    How long of a course is it?

A.    It's self-pace, and I'm about 80% done.

Q.    And how many credit hours is it?

A.    It – I feel bad.  I don't think it has credit hours.  It's like a certificate program.

Q.    Okay.  What's the normal – if you were to do this full time, 40 hours a week, how quick would it, would you be able to accomplish it?

A.    Oh, finish the school, you mean?

Q.    Yes.

Atty:  Speak up.

A.    Oh, speak up?  Trying to think.  I want to say a year.

Q.    How many hours a week do you engage in study for this program?

A.    I probably study about three days a week.

Q.      And is that in evenings, throughout the day?

A.      Yeah, I pretty much do it during the night, because I sleep in the day and then stay awake at night.  So, pretty much, I study all night.

        . . .

Q.      And the medical billing you're doing – school you're doing now, do you expect to finish that?

A.      Yeah, um-hum.

Q.      And is that a job you think you'd be able to do?

A.      I'm hoping, that's why I'm doing it.  It's been a struggle for me to find work that I can do.  My – the reason I – I heard it on the radio, and they were making a big deal about working at home, so that's kind of why I thought, oh, that's, you know, something I could probably do.  And, you know, so I'm trying to – hope that I can – when I'm done I can do that at home, basically.

Q.      Okay.  Are you struggling at all with the material, comprehension.

A.      Off and on.  Like, I try to do, like, certain things that help my – I get brain fog, but – I know it sounds strange.  Sometimes I have, like, an ionizer or the TENS unit that I use on my back.  I know it's some – for some reason it might stimulate my brain and kind of help me with memory and stuff.  So I use that and the ionizer rocks, and that seems to help.  I don't know why, but I just have it nearby when I'm studying, so that seems to help.

. . .

Atty:   So the reason that you're going through this medical coding and billing is because you had experience doing this back in 2003, and you're hoping that maybe you could do that from home?

A.      Yes.

Atty:   You don't think that you could work eight hours a day, five days a week at a job site?

A.      Oh, no.

Atty:   Okay.  Why not?

A.    I've just tried it.  I've been down that road, tried really hard, and it just –
      yeah, because of my – all of my health issues just, kind of accumulate
      from the stress. . . .

(Tr. 39-40, 48-49.)   The ALJ subsequently determined, based on this testimony, that since

Ms. Matlock was in school for a semi-skilled job, she must have the mental capacity for

semi-skilled work.  The ALJ then concluded that Ms. Matlock was capable of performing her

past relevant work as a medical coder.  (*Id.*)

There are several problems with the ALJ's conclusion.  First, the ALJ failed to make any

of the necessary findings about the mental work demands of Ms. Matlock's previous "on-the-job

training" medical coder position, which an ALJ must do in the second phase of the step four

findings.  The Tenth Circuit clearly instructs that

> [a]t the second phase of the step four analysis, the ALJ must make findings
> regarding the physical and mental demands of the claimant's past relevant work.
> . . . *When the claimant has a mental impairment*, "care must be taken to obtain a
> precise description of the particular job duties which are likely to produce tension
> and anxiety, *e.g.,* speed, precision, complexity of tasks, independent judgments,
> working with other people, etc., in order to determine if the mental impairment is
> compatible with the performance of such work."

*Winfrey v. Chater*, 92 F.3d 1017, 1024 (10th Cir. 1996) (quoting *Henrie v. United States Dep't of*

*Health & Human Servs*., 13 F.3d 359, 361 (10th Cir. 1993)) (emphasis added).  Here, the ALJ

made no inquiry into, or any findings specifying, the mental demands of Ms. Matlock's past

relevant work as she actually performed it or as it is performed in the national economy.  This is

error.  *Id.*

Second, the ALJ improperly relied on Ms. Matlock's *enrollment* in a self-study course,

without more, as substantial evidence to support that Ms. Matlock could perform semi-skilled

work.  Here, other than Ms. Matlock's testimony about her enrollment in the course, the ALJ

failed to obtain or provide in the record any objective evidence about the course itself.  For

example, there is no objective evidence regarding the educational online institution offering the course; what, if any, prerequisites were required for taking the course; the course's level of complexity; Ms. Matlock's performance in the course; the average time it should take to complete the course in comparison to the time Ms. Matlock is actually taking;[14] whether completion of the course includes certification or whether certification testing is separate; or what Ms. Matlock would be qualified to do *if* she were to complete the course; *i.e.,* medical coding and/or medical billing. In other words, there is nothing in the record to support the ALJ's conclusion that Ms. Matlock is capable of semi-skilled work simply because she is enrolled in an online class that may or may not qualify her for a potential job that is classified as semiskilled. Moreover, the ALJ's conclusion flies in the face of the uncontradicted medical opinion evidence in this case that Ms. Matlock's mental impairments limited her to simple, unskilled work.[15]

Finally, and contrary to the ALJ's statement that Ms. Matlock indicated she was *not* having difficulty with the course material (Tr. 26), Ms. Matlock testified that she struggled with comprehending the material "off and on" due to brain fog (Tr. 48). Ms. Matlock further testified that even though she was hoping to find some kind of work she could do at home, she was incapable of working full time at a job site and had not worked full time since 2003 due to her medical conditions. (Tr. 49.) Thus, the ALJ mischaracterized Ms. Matlock's testimony, and

---

[14] When asked, Ms. Matlock thought that if someone were taking the course full time, forty hours a week, that it would take a year to complete the course. (Tr. 40.)

[15] On February 2, 2012, Dr. Wynne assessed, *inter alia,* that Ms. Matlock could read and understand basic written instructions and her concentration and ability to persist at *simple* work tasks was no more than mildly impaired. (Tr. 380.) He further assessed that Ms. Matlock could not interact well with the general public, her coworkers, or her supervisors. (*Id.*) On February 21, 2013, Dr. Mohney assessed that Ms. Matlock could perform *simple unskilled work* with limited interactions with others. (Tr. 80.) On August 1, 2013, Dr. Cherry assessed that Ms. Matlock could perform *simple unskilled work* with limited interactions with others. (Tr. 111.) On May 28, 2015, Dr. Samuel assessed, *inter alia,* that Ms. Matlock had moderate limitations in her ability to understand and remember detailed instructions and marked limitations in her ability to carry out detailed instructions. (Tr. 530-31.) He further assessed that Ms. Matlock had moderate limitations in her ability to interact with the general public and accept instructions and respond appropriately to criticism from supervisors. (Tr. 531.)

failed to consider whether Ms. Matlock was capable of performing the work on a continuing basis if she were to successfully complete her at-home course.[16] *See* SSR 96-8p, WL 374184, at *7 (explaining that the ALJ must discuss the individual's ability to perform sustained work in an ordinary work setting).

For these reasons, the ALJ's fourth explanation for discounting Dr. Wynne's opinion is not supported by substantial evidence.

### e.     The ALJ's Fifth Explanation

Finally, the ALJ explained that Dr. Wynne did not have a treating relationship with the claimant and his evaluation was only a snapshot of her overall functional limitations. In *Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012), the Tenth Circuit held that a limited treatment relationship does not, *by itself,* form a proper basis for rejecting a medical-source opinion because "otherwise the opinions of consultative examiners would essentially be worthless, when in fact they are often fully relied on as the dispositive basis for RFC findings." *Id.* Although the ALJ provided other reasons for according little weight to Dr. Wynne's opinion, they are not supported by substantial evidence. And, because Dr. Wynne's consultative examiner's opinion cannot be discounted solely on that basis, the ALJ's fifth explanation for discounting Dr. Wynne's opinion is also erroneous.

For all of the foregoing reasons, the Court finds that the ALJ's reasons for discounting Dr. Wynne's opinion are not supported by substantial evidence.

---

[16] Although briefly touched on here, the Court does not fully analyze Ms. Matlock's argument that the ALJ's decision does not include a necessary function-by-function assessment of Ms. Matlock's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.

### 2. The ALJ's Failure To Evaluate the State Agency Nonexamining Psychological Consultant Opinions Is Not Harmless Error

"'It is the ALJ's duty to give consideration to all the medical opinions in the record. [S]he must also discuss the weight [s]he assigns to such opinions,' including the opinions of state agency medical consultants." *Mays v. Colvin*, 739 F.3d 569, 578 (10th Cir. 2014) (quoting *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012)). Further, the need for express analysis is only weakened "[w]hen the ALJ does not need to reject or weigh evidence unfavorably in order to determine a claimant's RFC." *Id.* (quoting *Keyes-Zachary*, 695 F.3d at 1162). The failure to weigh a medical opinion involves harmless error if there is no inconsistency between the opinion and the ALJ's assessment of residual functional capacity. *Id.* at 578-79 (citing *Keyes-Zachary*, 695 F.3d at 1162-63). In that case, the claimant is not prejudiced "because giving greater weight to [the opinion] would not have helped her." *Id.* (quoting *Keyes-Zachary*, 695 F.3d at 1163). Here, the ALJ mentioned the State agency psychological consultant opinions only by stating that they "determined that the claimant could perform simple unskilled work with limited interactions with others[.]" (Tr. 26.) This is insufficient. In this case, the State agency psychological consultant opinions are *inconsistent* with the ALJ's mental RFC, and giving them greater weight could have altered the ALJ's mental RFC. Further, in implicitly rejecting their opinions, the ALJ was required to provide an appropriate explanation for doing so. She did not. For these reasons, the ALJ's failure to consider and weigh the State agency nonexamining psychological consultant opinions is not harmless error.

### 3. The ALJ Applied the Incorrect Legal Standard for Weighing Dr. Samuel's Opinion and Her Reasons for According It Little Weight Are Not Supported by Substantial Evidence

The ALJ failed to apply the correct legal standard in evaluating Dr. Samuel's opinion. *See Langley*, 373 F.3d at 1119 (describing what has come to be known as the treating physician rule for evaluating and weighing treating physician opinions). Instead, the ALJ incorrectly evaluated Dr. Samuel's opinion in accordance with SSR 06-03. SSR 06-3 clarifies how the Administration considers both opinion evidence from sources who are not "acceptable medical sources" and decisions by other governmental and nongovernmental agencies on the issue of disability or blindness, neither of which applies to Dr. Samuel. SSR 06-03p, 2006 WL 2329939, at *1. But Dr. Samuel is a clinical psychologist at the University of New Mexico Health Sciences' Department of Family & Community Medicine, and as such, is an acceptable medical source.[17] Moreover, on September 23, 2014, Dr. Samuel engaged in a treating relationship with Ms. Matlock to address her depression, anxiety, and chronic pain. (Tr. 472.) Thus, he was also a treating physician.

The ALJ also failed to provide legitimate reasons for discounting Dr. Samuel's assessment. The ALJ first explained that she discounted Dr. Samuel's opinion because he was unable to assess Ms. Matlock's limitations in several functional areas. (Tr. 25.) However, in completing the medical source statement, Dr. Samuel explained that he had only seen Ms. Matlock twice and that the focus of their sessions was on her depression and not on assessing her capacity for work. (Tr. 530.) Nonetheless, Dr. Samuel assessed certain functional limitations while leaving blank the areas of inquiry he determined he was unable to evaluate.

---

[17] "Acceptable medical sources" are licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. SSR 06-03p, 2006 WL 2329939, at *1. (Effective March 27, 2017, 20 C.F.R. § 404.1502 was amended to include licensed audiologists, licensed advanced practice registered nurses, and licensed physician assistants as acceptable medical sources, but only with respect to claims filed on or after March 27, 2017. 82 Fed. Reg. 5844, 5863 (2017)).

(*Id.*)  The ALJ had a duty to evaluate Dr. Samuel's assessed limitations by applying the factors set out in the regulations.  *See Langley*, 373 F.3d at 1119 (even if a treating physician's opinion is not entitled to controlling weight, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the [regulatory] factors."  *Id.*  It was, therefore, improper for the ALJ to outright reject Dr. Samuel's assessed functional limitations simply because there were areas of functional limitation he determined he was unable to evaluate.

The ALJ next explained that she discounted Dr. Samuel's opinion because of the limited nature of their treatment history and because Dr. Samuel indicated that he relied on Ms. Matlock's self-reports of symptoms to reach his conclusion.  (Tr. 25.)  As to the former, although the length of the treatment relationship and the frequency of examination is one of the factors an ALJ must consider in evaluating and weighing a treating source opinion, it is not the only one.  *Hamlin*, 365 F.3d at 1215.  Here, the ALJ failed to consider at all that Dr. Samuel was a treating source and that his assessed limitations were consistent with the other medical opinions in the record.[18]  As to the latter, having found Ms. Matlock not credible, the ALJ could discount Dr. Samuel's findings to the extent they relied on what Ms. Matlock told him.  *Beard v. Colvin*, 642 F. App'x 850, 852 (10th Cir. 2016) (unpublished).  However, "a psychological opinion may rest either on observed signs and symptoms or on psychological tests," and Dr. Samuel's observations about Ms. Matlock limitations constituted "specific medical findings."  *Robinson*, 366 F.3d at 1083.  Here, the ALJ failed to discuss that Dr. Samuel diagnosed Ms. Matlock with major depressive disorder, and planned to rule out post-traumatic stress disorder, conversion disorder, and somatic disorder.  (Tr. 470, 472.)  The ALJ failed to discuss that Dr. Samuel

---

[18] *See* fn. 15, *supra.*

concluded that Ms. Matlock was "unable to work due to multiple somatic medical conditions."[19] (Tr. 470.) The ALJ failed to discuss Dr. Samuel's description of Ms. Matlock's mental limitations as emotionally compromised, somatic complaints, "foggy brain," sadness – chronic pain, and difficulty tracking conversation. (Tr. 531.) The ALJ failed to discuss that Dr. Samuel opined that Ms. Matlock met the listing criteria for 12.04 *Affective Disorder*.[20] (Tr. 532.) In short, the ALJ failed to discuss and provide any reasons for rejecting Dr. Samuel's objective diagnoses and descriptions of Ms. Matlock's mental impairments. For these reasons, the ALJ's explanation for according Dr. Samuel's opinion little weight is not supported by substantial evidence.

For all of the foregoing reasons, the ALJ failed to properly evaluate the medical opinion evidence related to Ms. Matlock's mental impairments and the ALJ's mental RFC is not supported by substantial evidence. As such, this case requires remand.

## C.     Remaining Issues

The Court will not address Ms. Matlock's remaining claims of error because they may be impacted by the ALJ's treatment of this case on remand. *Wilson v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

---

[19] The Court is aware that the ALJ is responsible for determining whether Ms. Matlock is disabled. 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1). However, an ALJ must consider and review opinions from medical sources that a claimant is disabled. *Id.*

[20] *See* §§ 404.1527(d)(2), 416.927(d)(2) (explaining that the ALJ will consider opinions from medical sources on issues such as whether a claimant's impairment(s) meet or equal the requirements of any impairment in the Listing of Impairments in appendix 1).

### IV. Conclusion

For the reasons stated above, Ms. Matlock's Motion to Remand or Reverse (Doc. 22) is

**GRANTED.**

_____
**KIRTAN KHALSA**
**United States Magistrate Judge,**
**Presiding by Consent**